## UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| **MICHELLE CALLAHAN,** | **CA No.:**   2020-cv-12258 |
| *Plaintiff,* | **PLAINTIFF DEMANDS TRIAL BY JURY** |
| **vs.** |  |
| **LOWELL GENERAL HOSPITAL** |  |
| *Defendant.* |  |

## COMPLAINT

This action is commenced by MICHELLE CALLAHAN (hereinafter "Plaintiff") against LOWELL GENERAL HOSPITAL (hereinafter "Defendant") to remedy and seek relief for unlawful employment practices arising under *Title VII of the Civil Rights Act of 1964,* 42 U.S.C. §§ 2000e-2, § 2000e-3 ("Title VII"), and The Massachusetts Fair Employment Practices Act, M.G.L. c. 151B (151B).

## PARTIES

1. Plaintiff presently resides in the city of Dunstable, county of Middlesex, within the State of Massachusetts and formerly worked for Defendant.

2. Lowell General Hospital is registered as a hospital entity with the Secretary of State in the State of Massachusetts and has a principal place of business located in Lowell, MA.

## JURISDICTION AND VENUE

3. This Court has jurisdiction to hear the Complaint pursuant to 28 U.S.C. § 1331.

4. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state claims are so related to Plaintiff's federal claims that they form part of the same case

1

or controversy.  Consideration of judicial economy, fairness, and convenience warrants this Court's

exercise of supplemental jurisdiction over Plaintiff's state law claims.

5. Venue of this action lies pursuant to 28 U.S.C. § 1391(b) because Defendant conducts business in

Massachusetts within the judicial district of this Court, as well as because the alleged unlawful practices

occurred within the state of Massachusetts within the judicial district of this Court.

## ADMINISTRATIVE PROCEDURES

6.   On or about March 14, 2020, Charges of Discrimination were timely filed with the Massachusetts

Commission Against Discrimination (MCAD) and co-filed with the Equal Employment Opportunity

Commission (EEOC).

7.   On or about October 29, 2020, the MCAD, and subsequently the EEOC, issued its Dismissal

("Withdrawal Notice") (MCAD No. 20BEM01018; EEOC NO. 16C-2020-01406) enabling this private

civil action to be filed.

8.  This Complaint was timely filed after issuance of the withdrawal and Withdrawal Notice.

## FACTUAL ALLEGATIONS

9.  Plaintiff began working for Lowell General Hospital (herein "LGH," "Lowell," or "Defendant") on

or about November 7, 2017 as a Paramedic, at its Lowell, Massachusetts location.

10.   LGH is a highly respected paramedic unit that Plaintiff was hoping would catapult her to the next

level of her career, in areas including life flight work.

11.   Plaintiff is a woman and single mother and thus is afforded the protections of 151B and Title VII.

12.   At all times relevant, Plaintiff's performance was at or above her employer's reasonable

expectations.

13.   At all times relevant, until reports of inappropriate behavior caused him to resign near the time of

Plaintiff's constructive termination, Shaun Mr. Dean ("Mr. Dean") was Plaintiff's supervisor.

14.   Mr. Dean, at all times relevant, treated female paramedics less favorably than male paramedics.

2

15. For example, upon starting work, Plaintiff was informed by Mr. Dean that she would be forced to wear men's pants unless she bought her own woman's uniform, which she was not paid for.

16. As another example, during her tenure, on multiple occasions, Plaintiff asked for feedback from male superiors, including Mr. Rainville, Mr. Dean, and Dr. Drake, only to be ignored.

17. Nonetheless, Plaintiff was initially happy in her job as a Paramedic at Lowell.

18. On or about December 14, 2018, Amanda Leavitt, a charge medic, invited employees to her Christmas party, which Plaintiff attended, as did her supervisor Mr. Dean.

19. Part way through the party, Mr. Dean inappropriately and loudly asked Plaintiff who she was "fucking," then just as loudly, and in front of colleagues, he asked Plaintiff, "Did you fuck Andy?"; Mr. Dean was referring to Plaintiff's frequent paramedic work partner, Andrew Mustone.

20. Plaintiff was uncomfortable, asked Mr. Mr. Dean to stop and when he would not, asked him to step out to stop Dean's intentional humiliation.

21. Mr. Dean refused to stop and asked Plaintiff again if she "fucked Andy" and continued to say it was "not against policy" if she had, and that he "just wanted to know."

22. Plaintiff made it clear to Mr. Dean that she did not like the comments and told him to stop.

23. Mr. Dean became unhappy at Plaintiff's response to him, having indicated it was unwelcomed; Mr. Dean then threatened that Plaintiff did not "want to get on his bad side."

24. Plaintiff removed herself from Mr. Dean but he would not stop inquiring about her sex life publicly at the party, which he continued and escalated after Plaintiff told him to stop.

25. In response, Mr. Dean asked Amanda if Mustone and Plaintiff were "sleeping over."

26. Plaintiff was continually humiliated at that party.

27. Then, the next morning, Mr. Dean text Mustone asking if he "tapped that" referring to Plaintiff.

28. That text further humiliated Plaintiff when she was told about it.

3

29. Following the Christmas Party, and Plaintiff's rebuke of Mr. Dean's overt sexual harassment, Mr. Dean began to treat Plaintiff notably less favorably and more disparately.

30. For example, on or about December 28, 2018, Mr. Dean approached Plaintiff in the ambulance bay and told her that she was going to have to be open to a "total schedule change."

31. Plaintiff told Mr. Dean that she had been there long enough to have a set schedule; Plaintiff stated that she could not accommodate a schedule change due to caring for her autistic son.

32. Mr. Dean flippantly told Plaintiff, "[t]oo bad."

33. That conversation was the first time that Plaintiff had expressly informed Mr. Dean that she was a single mother caring for an autistic son.

34. Mr. Dean tried to change Plaintiff's schedule anyway.

35. Similarly-situated male paramedics were not threatened with an unnecessary schedule change.

36. On or about December 31, 2018, Plaintiff emailed Mr. Dean to complain about his proposed schedule change and to further explain the difficulties for her, as a mother of an autistic child.

37. In this email Plaintiff also complained about her schedule change in comparison to similarly-situated coworkers; she complained about being asked to change her schedule and impact her parenting duties to accommodate "school schedules" and "a new hire" who she had seniority over.

38. On or about January 2, 2019, Mr. Dean replied stating that Plaintiff and he needed to discuss the schedule change with Plaintiff in person, but failed to do so.

39. On or about January 8, 2019, Plaintiff complained to HR about Dean's unfair schedule change by phone; this was her first of many complaints about Mr. Dean to HR.

40. In response to Plaintiff's complaint of an unfair and disparate schedule change, HR's only "swift remedial action" was to tell Plaintiff to discuss it with Mr. Dean or use intermittent FMLA.

4

41. In fact, Maureen Fitzpatrick of HR sent an email the next day, January 9, 2019, stating she had "reached out" to Mr. Dean "following our conversation regarding your concerns" but provided no information about what actions would be taken to address Mr. Dean's unfair treatment.

42. Neither directing Plaintiff to re-discuss unfair treatment tied to gender *by* her supervisor *with* that supervisor, nor using FMLA to avoid an unfair schedule changes, were proper remedial actions.

43. Dean learned of Plaintiff's complaint to HR and in response, and began retaliating against Plaintiff.

44. For example, approximately two days later, on or about January 11, 2019, Plaintiff met with Mr. Dean and Tracy Markus, the department administrator, and during this meeting Mr. Dean suddenly began questioning Plaintiff's triage skills.

45. Specifically, Mr. Dean stated that the "lack of training" Plaintiff was receiving from Doug Roberge was to blame for her newly-concerning triage skills which were not actually being questioned; additionally, Mr. Dean falsely claimed that nurses had complained about Plaintiff.

46. On or around January 25, 2019, Sara Winslow ("Ms. Winslow"), a Trinity Ambulance basic life support (BLS) EMT that often worked with Lowell paramedics – and a personal friend of Sean Dean – started harassing and threatening Plaintiff.

47. Plaintiff filed a complaint with Mr. Dean on or about January 27, 2019 for this harassment.

48. Mr. Dean took no swift remedial action in response and seemed to take some pleasure in it.

49. Winslow's harassment continued on social media into March of 2019; on or about April 3, 2019, Plaintiff emailed another complaint to Mr. Dean about the ongoing harassment by Ms. Winslow.

50. Mr. Dean stated he would "deal with this" but did nothing of the sort.

51. On or about May 1, 2019, Plaintiff swapped shifts with a co-worker.

52. Plaintiff is aware of no policies or restrictions on employees swapping shifts as needed.

53. Further, similarly-situated male employees switch shifts frequently without repercussions.

54.  However, in Plaintiff's case, Mr. Dean questioned Plaintiff why she switched shifts; Plaintiff told him she had swapped the day with another employee due to a need related to her autistic son; Plaintiff further informed Mr. Dean that she was still working with a senior-level partner.

55.  Mr. Dean unfairly reprimanded Plaintiff to "only allowed to work with Mike [Fligg] on the overnight shift"; Mr. Dean threatened he could pull her off other shifts "if it is too much."

56.  Plaintiff took the comment as a degrading female stereotype that women were weaker than men.

57.  Mr. Dean did not treat similarly situated male employees this way.

58.  Additionally, Plaintiff had no issues changing shifts prior to the night at the party when she objected to Mr. Dean's sexual harassment and prior to her January 8, 2019 HR complaint.

59.  Due to needing the day shift due to parenting duties, Plaintiff emailed Mr. Dean to change her schedule from Wednesday night with Mike Fligg to Wednesday day with an equal partner.

60.  On or about May 2, 2019, Mr. Dean emailed Plaintiff back stating only, "You need to stay on Wednesday night with Mike for his vast experience"; Plaintiff's proposed partner, Don Walker, had equivalent experience yet working with him would have enabled her to tend to her son's needs.

61.  Moreover, Don Walker even contacted Dean himself to ask why Plaintiff could not work with him.

62.  Mr. Dean responded on or around May 9, 2019, that he was "not changing her schedule because she [sic] rather have other open shifts instead."

63.  Mr. Dean's response demonstrates no legitimate reasons for his decision to bar Plaintiff from working a shift needed, due to duties as a mother.

64.  Mr. Dean did not treat male medics or female medics without parenting responsibilities this way; Mr. Dean also did not treat Plaintiff this way prior to her complaints to and about him.

65.  In or around this same time, Dean's sexual harassment of other employees came to light.

66.  For example, Mr. Dean owns a duplex on the beach and allows employees to use part of it during the summer; a female employee came to the beach house for a day to enjoy the beach.

6

67. Mr. Dean told the employee, his subordinate, that she should meet him upstairs for a drink; when the woman went upstairs, she found Mr. Dean naked in the other room and the woman left.

68. The employee relayed the event to Plaintiff who was not surprised given his actions toward her.

69. In May and June of 2019, Mr. Dean continued targeting Plaintiff unfairly because of her gender and in retaliation for Plaintiff's complaints to him and to HR.

70. Around this same time, specifically on June 13, 2019, Plaintiff had a call for a patient which her and Mr. Mustone attended to; Winslow from Trinity, and her partner Gavin Lewis, were there also.

71. During the call Mustone and Winslow were largely uninvolved in assessing or treating the patient, and both disappeared from the scene at critical times; their actions were due to not wanting to be near each other after what was reportedly a bad personal relationship breakup.

72. Thus, during the June 13, 2019 call, neither Mustone nor Winslow provided the required level of help to Plaintiff, who was the sole advanced life support (ALS) provider at the scene of a critically ill patient; Plaintiff was assisted only by a BLS and trainee (third rider) BLS.

73. The patient died at the hospital after Mustone gave a gravely inaccurate entry notification.

74. As a result of that event, Plaintiff wrote an incident report and thought the matter was over.

75. However, soon after, LGH and specifically Mr. Dean used the opportunity to further retaliate against Plaintiff by ensuring their later investigation results, and the last-minute report to OEMS/DPH involved an unfair result for Plaintiff.

76. Specifically, Mr. Dean, in conjunction with Dr. Drake and Mr. Rainville, intentionally started the investigation in a manner to lay the blame on Plaintiff.

77. Dr. Drake was the Medical Director for Paramedics at LGH and Mr. Rainville was the clinical leader; both were very good friends with Mr. Dean.

78. Specifically, rather than blame Mustone, who was inappropriately checked out of the call, rather than blame Winslow, who was also checked out of the call and neglected her BLS duties preventing

7

Plaintiff from focusing fully on her advanced life support (ALS) work, or rather than blame the

Nurse Chris in the ER, who had the patient under his care when the patient went to the bathroom

then was laid on a bed without a monitor or oxygen, Dean, Drake and Rainville blamed Plaintiff.

79. More specifically, despite Mustone not being involved in the care of the patient and despite calling

in a grossly inaccurate entry notification, he initially received little repercussions.

80. With respect to Winslow, no blame was placed on her by LGH despite her not assisting whatsoever

in the call and her turning the events on Plaintiff to protect herself from a second OEMS complaint.

81. And with respect to Charge Nurse Chris, despite him instructing the EMTs to take the patient to the

bathroom, ordering the patient to provide a urine sample, and ordering labs – all prior to the patient

being found by nurses coding on a bed without a monitor or oxygen, it was Plaintiff who LGH

blamed for the patient being left on that bed without a monitor or oxygen and eventually coding;

clearly if the nurse was ordering the EMTs to take the patient to the bathroom, ordering a urine

sample and ordering labs, the patient was under the care of the nurse or the nurse would be

breached the standard of care to have ordered such things prior to taking over care of the patient.

82. In fact, LGH later, unreasonably and extraordinarily, blamed Plaintiff for everything that happened

in the ER, blamed for provable machine errors in the SpO2 and monitor readings, and even blamed

– in conjunction with Mustone – for the grossly inaccurate entry notification which Plaintiff did not

and could not have had anything to do with because she was in the ambulance caring for the patient

while Mustone called in the notification in a separate vehicle, with no involvement from Plaintiff.

83. Further, of the charge nurse, Plaintiff, and Mustone, Plaintiff was the only one ever put on a

remediation plan or receiving any discipline for their acts and omissions that day.[1]

---

[1] Mustone was terminated a month later, but that was stated, by LGH only because he lied; they wrote in their position paper that "Because he had been less than forthright with LGH, the Hospital terminated his employment on July 9, 2019."

84. Plaintiff later found out that this investigation was, in part, also focused on her, due to Winslow making inaccurate reports of events to Mr. Dean – in fact Ms. Winslow incident report was oddly sent directly to Dean's computer and found by a secretary.

85. In the days after the June 13, 2019 call, Mr. Dean called a meeting with Plaintiff where she feared she would continue to unfairly targeted due to ongoing disparate treatment and retaliation.

86. Thus, prior to the meeting scheduled on June 20, 2019, Plaintiff requested HR attend the meeting, and also emailed Mr. Dean and Dr. Drake to inform them that she was requesting HR to be present.

87. In this email, Plaintiff complained about Ms. Winslow and Mr. Dean's involvement in the investigation into the June 13, 2019 call, and specifically about Mr. Dean's failure to resolve prior complaints related to Ms. Winslow which Plaintiff believed was influencing Winslow's reporting.

88. Prior to this meeting, Mr. Dean unfairly decided to place Plaintiff on an unusually harsh 30-day remediation plan where Plaintiff was demoted to working as a third-rider (like while in training) with supervision; in contrast, Mustone was allowed to work from the time of the incident until his much later termination in mid-July 2019 – for weeks – without a remediation plan and in full capacity; he was eventually terminated only because he lied about his entry notification.

89. On or about June 20, 2019, Plaintiff attended the planned meeting with Mr. Dean, Dr. Drake, Mr. Rainville, and HR, where she was informed that she would be on a 30-day remediation plan.

90. Plaintiff complained to HR about the unfair treatment between her and Mr. Mustone, and the unusually harsh punishment for a call she handled appropriately, especially under the circumstances of being left on her own.

91. In response, HR even commented that they found the treatment of Plaintiff unfair and unusual, but could do nothing in the face of Mr. Dean's directive.

92. On the day of that meeting, Plaintiff handed a letter dated June 18, 2019, which was a formal complaint about Winslow and Mr. Dean to HR, with copies given to Dean and Dr. Drake; this letter

reported Plaintiff's prior complaints about "numerous incidents with Ms. Winslow" and how "these incidents to my Department Head, Mr. Shaun Dean."

93. Plaintiff further reported that "I feel these complaints were not handled in the appropriate manner," complaining further about Mr. Dean's unfair treatment of Plaintiff and that he "did not take the appropriate actions when I first reported this behavior to him."

94. Finally, in that June 18, 2019 letter, Plaintiff also "formally request[ed] protection for retaliation from both my employer and Ms. Winslow."

95. The next day, on June 21, 2019, Mr. Dean called Plaintiff out of the blue and she was concerned he would berate her for her complaints about him to HR.

96. Thus, later on June 21, 2019, Plaintiff physically went to HR to ask what she should do.

97. Upon arriving, Patricia Basque and Maureen Fitzpatrick informed Plaintiff that they were on the phone with Mr. Dean; HR said that Mr. Dean was calling Plaintiff to inform her she was not allowed to work anymore because there was no remediation plan in place, an unheard of move.

98. Plaintiff complained to HR that it was unfair and asked to talk further to HR alone.

99. During this portion of the meeting Plaintiff reported and re-reported all of the recent unfair treatment by Mr. Dean towards her for over an hour.

100. During this meeting Plaintiff also bolstered her own reports of Dean's sexual harassment at the Christmas party with known acts of Mr. Dean sexually harassing others.

101. Specifically, Plaintiff reported that Mr. Dean had sent pictures of his genitalia, known crudely as a "dick pic," to a 19-year-old student paramedic that complained to Plaintiff about Mr. Dean's act.

102. During that meeting with HR, Patricia and Maureen from HR asked if Plaintiff could get them evidence and Plaintiff confirmed that she would.

103. That day, Dean learned, through Dr. Drake learning it from HR, that Plaintiff had made additional serious complaints about Dean to HR.

10

104. The next day, June 22, 2019, a Saturday, Dr. Drake, Mr. Dean, and Mr. Rainville filed a last-minute Serious Incident Report (SIR) with OEMS/DPH for the June 13, 2019 call.

105. It is notable that the LGH form states that the SIR must be filed within 5 business days of the incident being reported; since the incident occurred on June 13, 2019, a Thursday, 5 busines days would make the form deadline June 20, 2019[2]; even on a 7 business day deadline, the form was due to next business day after it was filed on Saturday June 22, 2019, making it last minute.

106. It is also notable that the LGH investigative notes by Dean, Drake, and/or Rainville, used to support the SIR, were typed notes that Plaintiff was never allowed to review for accuracy; a large number of statements typed were grossly inaccurate from what Plaintiff did – and would ever – say.

107. For example, LGH's Dean, Drake, and Rainville indicate in their "interview notes" that Plaintiff "reported that she believed the patient was sick, but not critical upon her arrival to the Hospital."

108. That statement was not uttered by Plaintiff and is not true; at all times after getting in the ambulance Plaintiff knew the patient was critical and she did all she could do being the only ALS present.

109. Dean, Drake, and Rainville's position that Plaintiff did not think the patient was critical is a primary bases for their discretionary judgement that Plaintiff violated the Statewide Treatment Protocols (STPs) on that call, which according to them justifies the SIR filed at OEMS/DPH.

110. But importantly, HR staff at LGH *contradict that Plaintiff did not think the patient was critical*; in its position paper LGH filed with the commission, even LGH confirmed a conversation (although

---

[2] LGH points out in their position paper that the correct timeframe for a reporting such as this to OEMS is actually 7 business days which means a June 13, 2019 incident would have to be filed by Monday, June 24, 2019. Thus, the filing on a Saturday, June 22, 2019 means the SIR was filed between the 6th and 7th business day, or in other words, filed at the last minute on a Saturday. That timing, also being the day after Plaintiff reported Dean's sexual harassment of her and "dick pics" sent to other women, which HR is believed to have told Dr. Drake, raises the inference that it was a last-minute decision for LGH to actually file with OEMS, which Plaintiff believes was motivated by retaliation for her reports about Dean which resulted in his forced resignation days later. Note also that filing a SIR with OEMS is only warranted if LGH believed that the STPs were violated or other major concerns; in other words, LGH has discretion to decide if filing a SIR is warranted. Had LGH they decided that Plaintiff did not violate the STPs, which the evidence supports even with the falsehoods included in the LGH "interview notes" for Plaintiff's interview, the decision to file a SIR or not was always at the discretion of Dean, Drake, and Rainville under 105 CMR 170.350(B).

not the actual words) between Plaintiff and HR[3] where Plaintiff told HR that once in the ambulance, Plaintiff knew the patient critical.

111. Plaintiff believes that Dr. Drake formed an opinion of the events based upon misinformation from Mr. Dean and he adopted Mr. Dean's position that was unreasonably unfavorable to Plaintiff.

112. Importantly, the day before the SIR was filed, on Friday, June 21, 2019, Dr. Drake made his bias against Plaintiff known; he told HR that he "would not be surprised if [Plaintiff's] license was taken away from her."

113. Notably, even with experienced medics, such as Rainville, upon information and believe have violated protocol (STPs) recently at LGH, yet these other medics are not treated in the harsh and unprecedented manner that Plaintiff was treated for acts that should not even be STP violations[4].

114. For example, in or around early 2019, a male medic administered TXA, a medication to stop internal bleeding which must be administered "no greater than 3 hours from the event" according to STP 6.5, at least 6 hours after the event, making administration of the drug a clear contradiction for the patient – and a clear protocol violation.

115. Notably, this male medic suffered no consequences, no remediation plan, and no other outcome other than the event was discussed in rounds.

116. Plaintiffs clearly disparate treatment regarding her remediation plan was, in fact, unprecedented.

117. Dr. Drake's statement to HR raise question of why he bothered with the unprecedented 30-day remediation, plan rather than just revoke Plaintiff's credentials and terminate her,[5] given that he felt her actions warranted loss of license from DPH.

---

[3] Conversation referenced at fn. 10 of the position paper.
[4] In October of 2020, Mr. Rainville, upon information and belief, had a patient with dangerously low SpO2 saturation and failed to provide ALS care, and instead provided only basic care which, as described, is a protocol violation.
[5] Statements by Drake to OEMS demonstrate that Dr. Drake never intended to give Plaintiff a fair chance and that his intention all along was to terminate her after she was humiliated in an unprecedented fashion. Even prior to her completion of her remediation plan, he stated to OEMS/DPH that he had "planned on revoking her credentials to practice

118. Notably, Dr. Drake has a history of punishing female medics disproportionally than males.

119. Specifically, in or around 2017 or 2018, a senior team of a female and male medic jointly tried to intubate a young patient but the intubation failed and the patient died.

120. Notably, only the female medic lost her RSI credentials.

121. Neither of these medics was assigned a remediation plan working as a third rider.

122. In effect, disparate and minimal discipline was assigned, despite the fact that failed RSIs are extremely uncommon, life threatening, and very serious incidents as compared to the allegations against Plaintiff.

123. Relatedly, in or around this same time, Mr. Rainville had a failed RSI infant intubation and he was never disciplined in any way.

124. On Sunday, June 23, 2019, Plaintiff began emailing Ms. Basque of HR information on the evidence she was preparing for HR regarding Dean's inappropriate "dick pic" text.

125. In these emails Plaintiff also thanked Ms. Basque for the impromptu meeting on June 21, 2019.

126. Through these emails, a meeting was scheduled for June 25, 2019; prior to this meeting on the morning of June 25, 2019, Plaintiff emailed Ms. Basque with a reiterated list of concerns she had about unfair treatment by Dean in addition to the concerns she raised about Mr. Dean's "dick pic."

127. Specifically, Plaintiff emailed several express complaints about unfair treatment, such as questioning why she was the only medics alleged to have violated protocol/STPs to be given this type of remediation plan/PIP and questioning Dean's selection of preceptors to evaluate her during her remediation plan and asking what qualification, other than Mr. Dean preference, they needed.

128. Plaintiff also questioned HR about Winslow's harassment, which had yet to be resolved and had led to false and misleading statements by Winslow regarding the June 13, 2019 call.

---

following her preceptor evaluations during the remediation" despite her 30+ preceptor evaluations being overall very good.

13

129. However most importantly, Plaintiff asked Ms. Basque about the status of *her complaints* from the prior week about Mr. Dean's *treatment of her*, which she believed warranted immediate investigation in *addition* to HR's investigation into the "dick pic" evidence; Plaintiff wrote:

> "What is going on with my complaint about being targeted and all the evidence I presented to you on that? Aside from the whole "picture" incident, or is that all lumped together? I know you said you spoke with Amy Hoey, and Im not sure if it was just about the pictures, or about the whole targeting/harassing situation. While this situation is being investigated, I'm ultimately left without a dept head. [Dean] is aware of my complaint, and I do not feel comfortable approaching him with any concerns I may have."

130. Ms. Basque responded only by telling Plaintiff that later that day on June 25, 2019 they would "discuss [her] concerns" and asked Plaintiff to come in early to do so, which Plaintiff agreed.

131. Plaintiff understood that she would be meeting Ms. Basque early to discuss her email complaints, then they would meet with Mr. Dean to review the remediation plan with HR present.

132. But when Plaintiff arrived at that June 25, 2019 meeting, Mr. Dean was already there with HR.

133. Thus, instead of Plaintiff being allowed to discuss her numerous concerns with Mr. Dean's "targeting/harassing situation" that Plaintiff had reported to HR, Mr. Dean took over.

134. But instead of going over the present remediation plan, Mr. Dean presented a remediation plan that Plaintiff had never seen before, from an event six months prior.

135. To be clear, on June 25, 2019, Mr. Dean presented Plaintiff with a remediation plan dated **January 10, 2019, from a December 18, 2018 incident** about a cardiac patient that Plaintiff had never heard of before being a problem, and a plan that she had never seen before, nor signed.

136. Plaintiff recognized the incident was about a patient she triaged who was brought to the hospital and who had later, at the hospital, was shown to have elevated Troponin in her blood, indicating a heart attack; Plaintiff recalls learning about the Troponin result at the hospital and also learning that the patient was not treated in an appropriate timeframe that she could determine.

137. In other words, Plaintiff recalled triaging the patient properly based on the reported symptoms and diagnostics, but when the patient arrived at the hospital, where she could have a blood test for Troponin, the woman's result was positive yet the hospital was not quick to attended to her.

138. In that meeting, Plaintiff questioned why she had never seen the six-month-old remediation plan prior and Mr. Dean said, in front of HR, "[o]h well, Casey was supposed to give it to [Plaintiff]."

139. Then Mr. Dean handed Plaintiff the first draft of the remediation plan for the June 13, 2019 call, dated June 25, 2019; it was full of provably inaccurate information, such as that Plaintiff was the only medic lacking a particular certification, which was flatly incorrect.

140. Plaintiff refused to sign the remediation plan and raised with HR and Dean that this was yet another form of harassment from Dean; she marked up the extensive vagaries in front of HR.

141. But each time Plaintiff crossed something off and made a comment, such as "I improved my intubations" Mr. Dean would snarky comment back, such as "it couldn't get any worse"; likewise, when Plaintiff clarified that Mr. Dean had incorrectly written that she was the only employee in her position without MAI certification, Plaintiff pointed out several others, by name, and Mr. Dean snarked back that those were "different situations" with zero elaboration.

142. Plaintiff felt attacked and HR did nothing; she repeatedly requested that Mr. Dean leave the room and finally HR requested the same of Dean and Mr. Dean left.

143. After Dean left, Maureen of HR, who remained in the room, asked Plaintiff if Mr. Dean always "talked to" her "like that," and if he was "rude" and "talked down" to her all the time.

144. Plaintiff confirmed that Mr. Dean did talk that way to her; HR offered no swift remedial actions.

145. While Mr. Dean was gone, Plaintiff reported that Dr. Drake was now also "retaliating [against her]" because of Dean and explained worsening circumstances with Dr. Drake.

146. HR pivoted away from Plaintiff's complaints against Drake and Dean, and focused on obtaining the photos of Mr. Dean's genitalia that he sent to the 19-year-old student.

15

147.   Plaintiff showed the pictures and Basque asked to take Plaintiff's phone, with the pictures, to meet leadership's, Amy Hoey, the VP and COO and Sabrina Granville, senior VP and chief HR officer.

148.   Sabrina Granville later returned to the HR office, gave Plaintiff her phone back to her, and told Plaintiff she "[was so sorry [Plaintiff] had been treated like [that]."

149.   Prior to the meeting ending, Plaintiff also expressly complained about the unfairness between her and Mustone's treatment following the June 13, 2019 call.

150.   HR offered no interventions or swift remedial action to address her reported concerns of Mr. Dean, Dr. Drake, or related to the grossly unfair and unusual remediation plan.

151.   Later that same day, June 25, 2019, Plaintiff emailed HR and expressly complained about her PIP/Remediation plan again, in writing, and again stated she was being "targeted."

152.   Plaintiff concluded by complaining about being out of work while her remediation plan was fixed, stating: "I was handed a plan, based on lies, and there are only 2 people who can adjust it.  One [Dr. Drake] is on vacation and the other [Dean] is someone who is being investigated[6] for targeting me."

153.   After Plaintiff's reports to HR, nothing happened with respect to her express complaints about Dean or Dr. Drake targeting her, despite multiple complaints in email.

154.   Plaintiff learned of Mr. Dean's resignation the next day, on or about June 26, 2019.

155.   Notably, after Mr. Dean resigned, and upon Dr. Drake returning from being on vacation, he carried the torch of retaliation against Plaintiff, as punishment for Dean's resignation.

156.   Mr. Rainville, who replace Dean (and was a close friend) also retaliated on Dean's behalf at times.

157.   Following June 25, 2019, Plaintiff again complained to HR about Dr. Drake's poor treatment; Plaintiff specifically complained "Drake [was] retaliating [against her] for [Dean] having to resign."

---

[6] Plaintiff does not believe now that HR ever even started an investigation into Dean's treatment of her, but instead focused only on the "dick pic"; she also believes HR never investigated her complaints about Dr. Drake.

158. HR said that was not how they "handle things," referring to Dr. Drake, and that they would speak with him and see if there was "another remediation plan he would agree to."

159. Dr. Drake unreasonably refused to change his course of action as to Plaintiff's remediation plan.

160. HR later told Plaintiff that there was nothing they could do as Dr. Drake "[would] not let [her] work under his license if [she] did not follow [his] plan."

161. But Dr. Drake's unreasonable plan had Plaintiff sitting home for weeks waiting for a remediation plan that did not have bold faced lies; she did not resume work until July 3, 2019.

162. Yet, during all of this time, Mustone was allowed to work under Dr. Drake's license, without a remediation plan or supervision, until July 9, 2019 when he was terminated.

163. Notably Mustone was not terminated for his acts and omissions the June 13, 2019 call, but instead, in the words of LGH, only for lying to LGH about the entry notification[7].

164. Conversely, Plaintiff was at home and not allowed to work from June 18, 2019 through July 3, 2019, and then was on an unprecedented 30-day remediation plan working as a third rider.

165. On June 27, 2019, HR's Ms. Basque contacted Plaintiff via email and scheduled a subsequent meeting with Mr. Rainville to review a revised remediation plan.

166. Plaintiff expressed concerns about Mr. Rainville and Dr. Drake, both friends of Mr. Dean, being in charge of implementing the plan, due to retaliation suffered in response to Dean's resignation.

167. Plaintiff was assured by HR, each and every time she complained about Mr. Rainville and Dr. Drake form June 25, 2019 forward, that they would not retaliate; that was wholly true.

168. Plaintiff's meeting with Rainville to go over the revised remediation plan was scheduled for July 1, 2019 and at the time, Plaintiff was positive about moving forward; on June 27, 2019, Plaintiff wrote to Ms. Basque, regarding that meeting, "I'm excited to meet with him and get back to work!!!"

---

[7] Page 7 of LGH's position paper, filed under oath with the commission states, "[Mr. Rainville] discovered that the call was completely different from what Mr. Mustone had represented during his interview. Because he had been less than forthright with LGH, the Hospital terminated his employment on July 9, 2019.

169. On July 1, 2019, Plaintiff met with Mr. Rainville and Jessica of HR, rather than Ms. Basque, Jessica's boss; Plaintiff was disappointed to find there were still notable concerns with the information provided in the remediation plan and she complained to Jessica.

170. Jessica, like Ms. Basque, did and said nothing to resolve the concerns.

171. Wanting to move forward, Plaintiff went out of her way to agree to the plan despite reservations.

172. On July 3, 2019, Plaintiff returned to work; however, as stated, she was only allowed to work as a third rider according to the highly unusual remediation plan.

173. To be clear, it was apparent to Plaintiff by this time that even HR found the plan unusual, since remediation plans universally involve a research paper or presenting a case, not third-rider, trainee status; as such, all of Plaintiff's colleagues called the plan/PIP "unprecedented."

174. Worse, the remediation plan was implemented by Dr. Drake and Mr. Rainville in a way that was intended to make Plaintiff's work life difficult.

175. For example, the hours Plaintiff could work were greatly limited from prior to the remediation plan and she was not allowed to work overtime; she was not even scheduled for 40 hours any more, severely impacting her pay check.

176. In fact, Plaintiff had to use her earned paid time off to make her pay check even close to being enough to live off of during that time.

177. Moreover, Dr. Drake and Mr. Rainville suddenly changed Plaintiff's schedule at the onset of the remediation plan, without notice, requiring her to change her schedule and care for her son last minute so she could return to work; they also put her on night shifts which had a lower call volume and is generally not allowed for third-riders, making the number of calls reviewed progress more slowly.

178. Additionally, during Plaintiff's remediation plan, Dr. Drake and Rainville choose "preceptors," the two coworkers that evaluated Plaintiff's work while she rode as a third rider, who were known to be tough judges; one of which, Hillman, was also tight with management as well due to her tenure.

179. The "preceptor" process required that after every call, the "preceptor" had to fill out a form evaluating Plaintiff's performance and both had to sign it; Plaintiff could only write responses.

180. Despite both preceptors being known as tough critics, with Hillman being moreso than the other preceptor Mr. Fligg, Plaintiff's preceptor evaluations were quite good.

181. In the end, 31 evaluations were provided to Plaintiff as part of the ongoing DPH case, and of those, Mr. Fligg completed 7, Ms. Hillman completed 23, and Mr. Rainville himself completed one.

182. On each of those 31 evaluations, there are 15 areas to be rated regarding performance on the call and an additional six general ratings; that means a total of 21 different areas were evaluated per call.

183. Of the 31 evaluations, that means there were the potential for 651 ratings of needs improvement, or the lower "does not meet standard" rating.

184. Plaintiff's results indicated of 651 potential ratings, only 26 of them indicated needs improvement; further there were no indication Plaintiff ever qualified for the lower rating of "does not meet standard" and she even earned 2 "exceeds standards" ratings from Hillman.

185. In fact, many of Hillman's preceptor evaluations provided very positive feedback including "very professional with a difficult patient nice job" on July 5, 2019 and "excellent IV" on July 12, 2019.

186. During the plan, Dr. Drake and sometimes Mr. Rainville, continued to target Plaintiff, such as claiming Plaintiff had a lack of progress and a lack of critical calls, which was due to being on night shifts and being scheduled less hours while being a third rider, none of which was her fault.

187. Specifically, Dr. Drake and Mr. Rainville also claimed that Plaintiff was "not having enough critical calls to show us any improvement," but that fact was due to their own scheduling.

19

188. Then, a couple weeks into the "remediation plan," on or about July 17, 2019, Plaintiff met with Mr. Rainville and he went over Plaintiff's calls on the remediation plan to date.

189. Mr. Rainville found no notable concerns with Plaintiff's preceptor evaluations to that point, which is consistent with the evaluations themselves that Plaintiff later obtained.

190. Plaintiff was half way through the remediation plan at that point and was not told by Dr. Drake or Mr. Rainville that there were any concerns about her skills.

191. Despite that, during July of 2019, Dr. Drake, in conjunction with Mr. Rainville, continued to target Plaintiff for harsh treatment, and ostracized Plaintiff.

192. For example, on frequent occasions when Plaintiff would see Dr. Drake or Mr. Rainville, such as in the ED, they would totally ignore her to the point it was uncomfortable to Plaintiff.

193. Moreover, Dr. Drake and Mr. Rainville actively avoiding their obligations to meet with Plaintiff, which was required by the remediation plan.

194. In fact, they both ignored her to such a degree it was counterproductive to the remediation plan, which expressly stated she would "meet weekly with the interim director of ALS [Rainville] and bi-weekly with the medical director [Dr. Drake]."

195. Since the purpose of the remediation plan was to improve Plaintiff, it is highly unusual to not even meet with Plaintiff other than the one-time, half-way through it, that Rainville met with Plaintiff.

196. In fact, Plaintiff had to initiate the one meeting she had with Rainville about her progress.

197. Additionally, upon complaining about her lack of work hours in a meeting with HR, Plaintiff asked if she could just drive the ambulance to make up hours and she was told "no," and that despite her years of experience and good record, that she "needed to be supervised by a preceptor at all times."

198. Notably, LGH now claims, in their position paper, that Plaintiff's use of her paid time off during this time showed she was checked out of the plan and intended to just leave; that was untrue as Plaintiff was just trying to make enough money to support herself and her son.

199. Dr. Drake did not do this to other medics/EMTs who were given a remediation plan because no other LGH medic known has had that type of remediation plan.

200. Plaintiff's was significantly worn down by the end of July of 2019, due to the scheduling, the stress of the remediation plan, and the daily targeting by Dr. Drake and sometimes Mr. Rainville.

201. During July of 2019, Plaintiff continued to complain to HR about her unfair treatment by Dr. Drake and Mr. Rainville regarding the remediation plan, but HR indicated Dr. Drake could essentially do what he wanted to her, so they took no remedial action to stop Plaintiff's persecution despite them known the plan was very unusual.

202. Dr. Drake continued to make it clear to Plaintiff that he wanted Plaintiff to be miserable and quit for reasons other than her work performance, or else he would fire her no matter her performance.

203. In fact, Dr. Drake told OEMS that even prior to her completion of her remediation plan, he had "planned on revoking her credentials to practice following her preceptor evaluations during the remediation" despite her 31 preceptor evaluations being overall quite good.

204. In fact, even Hillman, the toughest critic who was predominantly Plaintiff's preceptor, included a statement on July 26, 2019, three days before Plaintiff had to resign, which stated that Plaintiff had "improved in places that she was previously lacking."

205. Yet, Dr. Drake continued to treat Plaintiff as if the preceptor evaluations, and the positive feedback plus any relative improvement, did not matter – she was failing at her job in his mind.

206. On July 29, 2019, Plaintiff tried to meet with HR one last time to beg for help with Dr. Drake; Ms. Basque did not make herself available, as she had before.

207. Ms. Basque referred Plaintiff to her subordinate Jessica who had not been helpful in the past.

208. Thus, with no help from HR, and with HR deferring to Dr. Drake (and Mr. Rainville) for all grossly unfair treatment and decisions, Plaintiff's distress was unbearable and she felt she had to leave.

209. Thus, on July 29, 2019, with all but a couple days of the remediation plan successfully completed, Plaintiff felt she had no reasonable option but to be constructively discharged.

210. Within hours to days of Plaintiff's termination, Dr. Drake had already informed OEMS that Plaintiff had not completed her remediation plan, making the SIR at OEMS more serious.

211. Upon information and belief, Dr. Drake's strong position against Plaintiff, despite her preceptor evaluations and work performance, all but sealed Plaintiff's fate with OEMS/DPH.

212. Notably, Mustone was held much more accountable by OEMS/DPH than LGH ever did, and he gave up his license without a fight due to his role in that call.

213. Plaintiff continues to fight LGH and the OEMS/DPH's findings against her, based on LGH's biased[8], improper investigation and falsified interview notes, at great personal cost.

214. A few weeks Plaintiff's constructive discharge, specifically on August 19, 2019, Plaintiff got another job; however, the job was a step down and not a position to support a move to life-flight.

215. But for Mr. Dean's, and then Dr. Drake's and (sometimes) Mr. Rainville's, harassment, discrimination, and then retaliation, Plaintiff would have stayed at LGH and on her career path.

216. Plaintiff was harassed and discriminated against by Mr. Dean, initially, sexually and due to being a mother, and after Plaintiff reported Mr. Dean to HR starting in January of 2019, he retaliated;

---

[8] As just one example of the biased information LGH provided to DPH involves the preceptor evaluations of Plaintiff. There were over 30 of these in total but in response to DPH/OEMS's request for their investigation, LGH only promised DPH/OEMS 6 of these, and provided only 5. Importantly, three of the five (2 by Hillman and 1 by Rainville) appeared to be cherry-picked to convey among the worst evaluations of the 30+. Specifically, two (of the five evaluations provided to DPH) were completed by Hillman and both indicated issues related with ECG/12-lead; this is the same type of issue that LGH claims was a clinical deficiency of Plaintiff on the June 13, 2019 call. Notably, those two evaluations are the only two of over 30 that note such an issues, yet both were given to DPH non-coincidentally. \

Also notable is that OEMS concluded that there were "several calls with acutely ill patients in which preceptors identified areas where [Plaintiff] needed to improve...regarding [Plaintiff's] assessment skills [] differential diagnoses [and] scene management." Yet, of the five preceptor evaluations sent to DPH, each with 21 possible ratings that could be rated as needing improvement, Plaintiff had 0 needs improvement ratings on 3 of the preceptor evaluations, one minor needs improvement for Rainville's one evaluation, and three total needs improvement marked on the 2 Hillman evaluations. There were zero "does not meet standard" ratings on any of these notably; also in the aggregate, out of a total of 1-5 possible ratings, those 5 evaluations only had a total of 4 needs improvement ratings. Thus, OEMS's conclusion that there were "several" deficiencies seems to greatly overstate the negativity of the preceptor evaluations, even those hand picked by LGH.

following Mr. Dean's subsequent resignation, due to one of Plaintiff's reports to HR, Mr. Rainville and Dr. Drake took over retaliating against Plaintiff which she reported frequently.

217. HR's and LGH's failure to remedy the hostile work environment, created by Mr. Dean, and later Mr. Rainville and Dr. Drake's retaliation, is the direct and proximate cause of Plaintiff's constructive discharge that occurred on July 29, 2019.

218. Further, Mr. Dean, Mr. Rainville, and Dr. Drake's retaliation has spilled over to Plaintiff not just losing her job but her having to presently fighting for her EMS license due to no fault of her own.

219. As a direct and proximate result of Defendant's hostile work environment and discriminatory actions on the basis of sex/gender, and in retaliation for protected activity reporting her own and others' sex-based harassment, Plaintiff suffered and continues to suffer loss of income and earning capacity; loss of work-related benefits, privileges, promotions, and status; she experienced humiliation and loss of standing in the community; suffered and continues to suffer from extreme emotional distress and mental anguish resulting in physical injury; she has endured significant financial strain due to defending her license with OEMS, and suffered other injuries. All damages continue to date.

## COUNT ONE
### *SEX – DISCRIMINATORY TERMS AND CONDITIONS*
### *SEX – DISCRIMINATORY CONSTRUCTIVE TERMINATION*
### ***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2 and Violation of 151B (151B)***

220. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

221. Plaintiff is afforded protections from discrimination and harassment on the basis of sex or gender under Title VII and 151B.

222. Defendant's agent subjected Plaintiff to disparate treatment because of being a female paramedic, because of being a mother (i.e. sex), and Plaintiff was also harassed sexually by her boss, all of which changed the terms and conditions of her employment in the ways stated above.

223. Defendant's agent knew of the disparate treatment and harassment by Plaintiff's direct boss(es), through reports to HR, yet Defendant failed to take swift, remedial action in violation of, *inter alia*, Title VII and 151B.

224. Defendant's agents constructively terminated Plaintiff because of her sex or gender in violation of, *inter alia*, Title VII and 151B.

225. Defendant's agents' discriminatory conduct, policies, and practices were intentionally discriminatory, motivated by animus, impermissible and unlawful considerations and violate, *inter alia*, Title VII and 151B.

226. Defendant has a pattern or practice of harassing and discriminating against women EMTs and paramedics that are single mothers.

227. But for Defendant's agents' intentional discrimination, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment and retaliation by one's direct bosses.

228. Plaintiff experienced the damages aforesaid as a proximate result of Defendant's agents' intentional conduct.

229. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

230. Defendant is vicariously responsible for the acts and omissions of its agents under *Respondeat Superior*.

## COUNT TWO
### SEX RETALIATION – *RETALIATORY TERMS AND CONDITIONS OF EMPLOYMENT*
### SEX RETALIATION – *RETALIATORY CONSTRUCTIVE TERMINATION*
***Violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3 and Violation of 151B (151B)***

231. Plaintiff incorporates by reference ALL paragraphs above as if fully set forth herein.

232. Plaintiff was protected from retaliatory harassment, discrimination, and termination as a result of engaging in protected conduct under Title VII and 151B.

233. Plaintiff engaged in protected conduct, opposed unlawful conduct, and exercised her rights under the Title VII and 151B, by reporting her own and others' harassment and discriminatory treatment, because of a protected class, to supervisors, managers, and HR.

234. As a result of Plaintiff's protected activity, Plaintiff was subjected to retaliatory treatment which changed the terms and conditions of her employment in the ways stated above.

235. Defendant's agents knew of the discriminatory and harassing conduct perpetrated by managers, through reports to HR, but Defendant still failed to take swift, remedial action in violation of, *inter alia*, Title VII and 151B.

236. Defendant's agents constructively terminated Plaintiff in retaliation for her protected activity in violation of, *inter alia*, Title VII and 151B.

237. But for Defendant's agents' retaliatory conduct, Plaintiff would not have been constructively terminated; no reasonable person in Plaintiff's circumstances could have remained in that environment without remedy from harassment and retaliation

238. Defendant's agents' retaliatory conduct, policies, and practices were intentionally retaliatory, motivated by animus, impermissible and unlawful, thus violating, *inter alia*, Title VII and 151B.

239. Plaintiff experienced the damages aforesaid as a direct and proximate result of Defendant's agents' intentional conduct.

25

240. Because Defendant's conduct was intentional, constitutes gross negligence, recklessness, and was willful and/or wanton, punitive or exemplary damages are warranted.

241. Defendants are responsible for the acts and omissions of the Defendant's agents under the theory of *Respondeat Superior*.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that this Court:

a. Order judgment for Plaintiff against Defendant on all Counts of the Complaint and declare that the practices detailed in this Complaint are unlawful;

b. Order, for all applicable Counts, that Defendant make Plaintiff whole by awarding appropriate back pay with interest, front pay, compensation for all other lost income and benefits, earning capacity, and all other relevant entitlements and emoluments;

c. Order, for all applicable Counts, that Plaintiff be awarded an amount of money which will fairly compensate her for mental anguish, emotional pain and suffering, damage to her reputation, loss of standing in the community, and other damages incurred;

d. Order, for all applicable Counts, that the Defendant pay Plaintiff's costs and reasonable attorney's fees resulting from this action;

e. Order, for all applicable Counts, that the Defendant pay punitive or exemplary damages, as appropriate to punish Defendant for its malicious conduct, reckless conduct, and/or callous indifference to the statutorily and common law protected rights of Plaintiff;

f. Order, for all applicable Counts, that Defendant pay post-judgment interest where appropriate and allowable by law;

g. Order, for all applicable Counts, that Defendant pay pre-judgment interest, including interest for all damages awarded to Plaintiff from the date the cause of action accrued, where appropriate and allowable by law;

26

h. Retain jurisdiction of this action to ensure full compliance; and

i. Order, for all Counts, such other relief to Plaintiff as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

### *PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE*

December 20, 2020

Respectfully Submitted by Plaintiff,
MICHELLE CALLAHAN
By her attorney,

 /s/ Paige Munro-Delotto
Paige Munro-Delotto, Ph.D., Esq.
BBO# 690605
Munro-Delotto Law, LLC
400 Westminster Street, Suite 200
Providence, RI 02903
(401) 521-4529
(866) 593-9755 (fax)
Email: Paige@pmdlawoffices.com